UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 21-cv-81096-MATTHEWMAN

RUTH GROSE,

    Plaintiff,

vs.

AMERICAN AIRLINES, INC.,

    Defendant.
_____/

FILED BY ____KJZ____ D.C.

Jul 11, 2022

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - West Palm Beach

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DE 23]

**THIS CAUSE** is before the Court upon Defendant, American Airlines, Inc.'s ("Defendant" or "American") Motion for Summary Judgment ("Motion") [DE 23] and Defendant's Statement of Material Facts in Support of Its Motion for Summary Judgment ("SMF") [DE 24]. Plaintiff, Ruth Grose ("Plaintiff" or "Grose") has filed a response [DE 30] and Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment [DE 31]. Defendant has filed a reply [DE 35] and Reply Statement of Material Facts [DE 34]. The matter is now ripe for review, and the Court has carefully considered the filings and attachments thereto, the arguments of counsel, and the entire docket in this case.

### I.    THE COMPLAINT [DE 1]

Plaintiff's Complaint contains four counts against Defendant: violation of Title II of the Civil Rights Act of 1964—discrimination on the basis of race (Count I); violation of the Florida Civil Rights Act of 1992—discrimination on the basis of race (Count II); violation of Title II of the Civil Rights Act of 1964—discrimination on the basis of gender (Count III); and violation of

1

the Florida Civil Rights Act of 1992—discrimination on the basis of gender (Count IV) *See* Compl., DE 1.

## II.     UNDISPUTED FACTS

The following facts are drawn from the uncontested portions of the record together with Defendant's Statement of Material Facts ("SMF") [DE 24], Plaintiff's Response SMF [DE 31], and Defendant's Reply SMF [DE 34].

American is a commercial airline that offers thousands of daily flights to hundreds of destinations throughout the United States and abroad and has operations at airports throughout the country, including at Palm Beach International Airport (PBI) in West Palm Beach, Florida. [Def.'s SMF ¶ 1]. Safety is American's top priority. [Def.'s SMF ¶ 1]. Grose is a black female and the Plaintiff in this case. [Def.'s SMF ¶ 1]. Before working for American, Grose worked for several airlines at various airports. [Def.'s SMF ¶ 3]. Prior to the American Airlines–U.S. Airways merger, Grose worked for U.S. Airways as a Ramp Manager in Philadelphia, a Ramp Manager and Customer Service Manager ("CSM") in Chicago, and a CSM in Memphis. [Def.'s SMF ¶ 3]. Around the time of the merger, Grose worked as a Catering Manager in Philadelphia. [Def.'s SMF ¶ 3].

In or around September 2018, Grose transferred to PBI, where she worked as a CSM for American until her separation in January 2020. [Def.'s SMF ¶ 4]. At PBI, Grose reported to the General Manager, Ruth Hightower, a black female. [Def.'s SMF ¶ 5]. In turn, Ms. Hightower reported to Scott Clementi, the Managing Director for American's eastern region. [Def.'s SMF ¶ 5]. Clementi is a white male. [Pl.'s Reply SMF ¶ 44].

Grose's duties as a CSM at PBI included making sure that the agents above the wing were servicing the customers, making sure that they were on the aircraft in a timely manner, and also

2

managing the team on the ramp simultaneously with that flight to ensure that they were getting the customers' bags loaded and everything done on a timely basis and getting out customers out on time and safely. [Pl.'s Resp. SMF ¶ 6]. Above all else, Grose shared responsibility for ensuring safety. [Def.'s SMF ¶ 7]. Safety is American's top priority, and every employee is responsible for putting safety first. [Def.'s SMF ¶ 7]. Grose was additionally responsible for training other employees that safety must always come first. [Def.'s SMF ¶ 7].

On December 28, 2019, Flight 1971 arrived at PBI from Dallas. [Def.'s SMF ¶ 8]. Because the plane arrived late to PBI, Flight 1971 would be considered a "quick turn," meaning employees would have to work quickly to get the flight out on time. [Def.'s SMF ¶ 8]. After the passengers boarded and the plane was ready for departure, Crew Chief Michael O'Brien tried to push the plane away from the gate, but the pushback would not start. [Def.'s SMF ¶ 9]. A pushback (sometimes referred to as "pushback tractor" or "pushback tug") is a vehicle that is used to physically push an aircraft backwards away from the gate and ramp area so it can depart. [Def.'s SMF ¶ 9].

O'Brien radioed another Crew Chief at a nearby gate to get a different pushback. [Def.'s SMF ¶ 10]. In the meantime, O'Brien (who was on the right side of the plane) tried to use a belt loader to move the pushback tug away from the aircraft, but he was unsuccessful. [Def.'s SMF ¶ 10]. A belt loader is a vehicle with a long conveyor belt that is used to load and unload baggage onto and off a plane. [Def.'s SMF ¶ 10]. According to O'Brien, the belt loader is not supposed to touch the aircraft. [Def.'s SMF ¶ 10]. O'Brien told the other Crew Chief to get a second belt loader so they could use both to try to move the inoperable pushback tug. [Def.'s SMF ¶ 11]. The other Crew Chief refused to bring over the second belt loader, but Grose agreed to do it instead. [Def.'s SMF ¶ 11]. Grose admits that she got on a belt loader at a nearby gate, but it is disputed whether

3

she drove under the jet bridge. [Def.'s SMF ¶ 12; Pl.'s Resp. SMF ¶ 12]. Grose has claimed in the past that she never drove under the jet bridge but instead drove under the aircraft's wing in order to line up with the pushback on the left side of the plane. [Def.'s SMF ¶ 14].

Grose admits that the rubber part of the railing was touching the aircraft. [Pl.'s Resp. SMF ¶ 16]. It is disputed, however, whether part of the belt loader actually "hit" the side of the airplane. [Def.'s SMF ¶ 16; Pl.'s Resp. SMF ¶ 16]. Grose admits that, when used properly, a belt loader should not make contact with any part of the aircraft. [Def.'s SMF ¶ 17]. She admits that the way the belt loader touched the aircraft when she used it is different than the way it ordinarily touches the aircraft. [Def.'s SMF ¶ 17].

After the rubber part of the railing touched the aircraft, Grose backed up, adjusted her angle, and tried again. [Def.'s SMF ¶ 19; Pl.'s Resp. SMF ¶ 19]. With the addition of a second belt loader, the ramp crew moved the malfunctioning pushback tug away from the aircraft, which made room for a replacement pushback to connect to it. [Def.'s SMF ¶ 19]. Grose did not get off the belt loader to inspect the aircraft, but she did look for scratches and dents just as she did when she was ramp lead. [Def.'s SMF ¶ 21; Pl.'s Resp. ¶ 21]. Grose did not tell the captain or first officer of Flight 1971, or tell maintenance, about what had happened since she did not believe it was a reportable event since it was just a "tap" or a "touch." [Def.'s SMF ¶ 21; Pl.'s Resp. ¶ 21].

Grose admits she is not formally trained in aviation mechanics and is not licensed by the FAA as an aviation mechanic; however, she worked on the ramp for 16 years and inspected aircraft regularly as ramp lead. [Def.'s SMF ¶ 23; Pl.'s Resp. ¶ 23]. Grose also did not receive formal training about ramp operations from American, but, after she was hired as a manager, she "shadowed another manager to see how the operation ran," and she also had additional knowledge from her years of industry experience working the ramp for other carriers. [Pl.'s Resp. ¶ 42; Def.'s

4

Reply SMF ¶ 42]. Plaintiff also testified that she was required to keep up with various trainings and that her manager would discuss important information with her, such as changes in policies. [Pl.'s Resp. ¶ 42; Def.'s Reply SMF ¶ 42].

Grose waited until two days after the incident to finally report it in an email to her supervisor, Ruth Hightower, because Hightower was out of work dealing with a personal matter. [Def.'s SMF ¶ 25; Pl.'s Resp. ¶ 25]. In that email, Grose stated, "I accept the outcome of what you say or do. I can only say I apologize to you because your expectation is your leadership will always practice the safety we preach. And I just breached safety last week to the ramp." [Def.'s SMF ¶ 25]. The safety managing director told Clementi about the reports, and Clementi was initially in disbelief that a CSM would do what Grose had done. [Def.'s SMF ¶ 27]. Grose admitted that she made a poor judgment call and that her "failure was in using a belt loader." [Def.'s SMF ¶ 29]. She admitted she should have waited to see if Operations would send assistance. [Def.'s SMF ¶ 29].

After completing the investigation, Clementi concluded that Grose had committed "egregious" violations of safety policies and a complete failure of leadership warranting termination. [Def.'s SMF ¶ 30]. In addition to violating several policies, Clementi believed that Grose's conduct demonstrated a complete failure of leadership because she knowingly and willingly violated safety policies that she was charged with enforcing and did so in front of her subordinates, which could encourage them to do the same thing. [Def.'s SMF ¶ 32]. Clementi was surprised by how brazen Grose was about her violations, which included directing employees to also violate safety policies. [Def.'s SMF ¶ 32]. It was clear that Grose knew these policies. [Def.'s SMF ¶ 32]. Indeed, she had taught them to the ramp agents. [Def.'s SMF ¶ 32]. She nevertheless committed those violations. [Def.'s SMF ¶ 32].

Clementi's own notes reflect that O'Brien admitted to directing Grose to bring over a second belt loader. [Pl.'s Resp. SMF ¶ 32]. However, Clementi has testified that neither Grose's race nor sex had any bearing on Clementi's decision to terminate her. [Def.'s SMF ¶ 35]. Clementi also testified that the termination decision was based on the December 28, 2019 incident and the egregious violation of policies. [Def.'s SMF ¶ 35].

Grose also contends that several of her subordinate employees should have been terminated for witnessing or participating in Grose's misconduct and not stopping the plane from departing. [Def.'s SMF ¶ 36]. These employees include Crew Chief Michael O'Brien, Ramp Agent Frank Puleo, and Operations Agent Robin Woods. [Def.'s SMF ¶ 36]. Each of these employees had a different position from Grose, reported to a different supervisor (indeed, they reported to Grose herself), and was a member of a union. [Def.'s SMF ¶ 36]. Further, Grose admits there is no evidence that any of these employees drove under the jet bridge or wing of the aircraft or hit the aircraft with ground equipment. [Def.'s SMF ¶ 36].

Grose believes that, if she was going to be terminated, then Michael Stafford, a white male who was Customer Service Manager at Tampa International Airport (TPA), should have also been terminated instead of receiving lesser discipline for engaging in similar conduct. [Def.'s SMF ¶ 37]. In December 2019, around the time of Grose's incident, Stafford was moving a set of air stairs to the ramp area at TPA. [Def.'s SMF ¶ 38]. Air stairs are stairs placed on the side of the plane to allow passengers to get on and off. [Def.'s SMF ¶ 38]. Stafford should not have been on the air stairs. [Def.'s SMF ¶ 38]. Stafford was distracted by the movement of another plane and as a result accidentally hit the tail of it with the air stairs, causing damage to the plane. [Def.'s SMF ¶ 38]. Stafford immediately reported the incident before the plane departed, consistent with American's policies. [Def.'s SMF ¶ 38]. When the investigation into this incident was complete, it was

determined that Stafford's conduct was accidental and the result of him losing situational awareness. [Def.'s SMF ¶ 39]. Stafford was given a written reprimand and prohibited from driving ground equipment but was not terminated for the offense. [Def.'s SMF ¶ 39]. Stafford was supervised by the General Manager of TPA, Frankie Jamison; however, it was Clementi that allowed Jamison to conduct the investigation and make the determination as to the discipline issued to Stafford. [Def.'s SMF ¶ 37; Pl.'s Resp. SMF ¶ 37].

Anthony Linarducci, the IAM (union) Safety Chairman in West Palm Beach, submitted a letter in support of Grose explaining that he believed Grose's intentions to be good. [Pl.'s Resp. SMF ¶ 48; DE 33-2]. The IAM (union) Shop Steward also submitted a letter of recommendation asking American to keep Grose employed. [Pl.'s Resp. SMF ¶ 49]. Hightower submitted the letters to Clementi along with a request for "the opportunity to speak with [him] (or whomever) before a decision is rendered." [Pl.'s Resp. SMF ¶ 49]. Additionally, several employees signed a letter of recommendation. [Pl.'s Resp. SMF ¶ 49].

Hightower told Clementi that she felt this was "another case of blatant discrimination that has been geared towards the Leadership Team in PBI." [Pl.'s Resp. SMF ¶50]. When Clementi informed Hightower that he decided to terminate Grose, Hightower remarked that the situation in Tampa involved a white man. [Pl.'s Resp. SMF ¶50]. In Ms. Hightower's January 10, 2020 email, she also described having discussed with Grose the importance of demonstrating appropriate compliance with safety procedures for the ramp agents, that safety always comes before on-time departure, and that Grose had learned that even "the slightest bump to the 'skin of the aircraft' could cause structural damage." [Def.'s Reply SMF ¶50].

In August 2019, several employees made a complaint accusing Hightower and Grose of racism. [Pl.'s Resp. SMF ¶53]. During the investigation, Hightower said that PBI had "a lot of

7

issues having diverse workgroups whether its racial, or gender biased. It's just a lot of disrespect at the station[.]" [Pl.'s Resp. SMF ¶52]. Hightower also said that "the Everyday Bias training was necessary for the entire station and the agents should have been more open minded to [taking] that particular class." [Pl.'s Resp. SMF ¶52]. Some of the employees at PBI said that "if [flight attendants] come here with those Black Lives Matters pins, we're going to wear our Trump pins." [Pl.'s Resp. SMF ¶53]. Hightower and Grose discussed the racism that existed at the station, but HR could not substantiate their claims. [Pl.'s Resp. SMF ¶54; Def.'s Reply SMF ¶54]. Hightower testified that the employees "treated each other as blacks and whites. There's clearly that separation there." [Pl.'s Resp. SMF ¶55]. Grose told an employee, Joe Vasquez, that he was out of uniform for wearing a t-shirt with an American logo and a slogan saying, "make American great again." [Pl.'s Resp. SMF ¶56]. In response, the employee made a "harassment" complaint against Grose. [Pl.'s Resp. SMF ¶56].

### III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) states in relevant part that "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of demonstrating to the court by reference to the record that there are no genuine issues of material fact that need to be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When a moving party has discharged its initial burden, the nonmoving party must "go beyond the pleadings," and, by its own affidavits or by "depositions, answers to interrogatories, and admissions on file," identify specific facts showing there is a genuine issue for trial. *Celotex*,

477 U.S. at 324. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

When deciding whether summary judgment is appropriate, the Court must view the evidence and all reasonable factual inferences in the light most favorable to the party opposing the motion. *Witter v. Delta Air Lines, Inc.*, 138 F.3d 1366, 1369 (11th Cir. 1998) (citations and quotations omitted). Any doubts regarding whether a trial is necessary must be resolved against the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

So long as the non-moving party has had an ample opportunity to conduct discovery, the non-movant must come forward with affirmative evidence to support its claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990). If the evidence advanced by the nonmoving party "is merely colorable, or is not significantly probative, then summary judgment may be granted." *Anderson*, 477 U.S. 242, 249–50.

## IV.  MOTION, RESPONSE, AND REPLY

In its Motion, Defendant argues that Plaintiff has no direct evidence of discrimination and cannot establish a *prima facie* showing of race or sex discrimination through even circumstantial evidence. [DE 23 at 6–9]. Defendant asserts that Plaintiff "cannot show that she was treated differently than similarly situated employees outside her protected class." *Id.* at 7. Defendant contends that none of the individuals who Plaintiff claims were not terminated (but perhaps should have been) are similarly situated to Plaintiff. *Id.* Defendant also argues that it has "articulated a legitimate, non-discriminatory reason for discharging Grose—her flagrant violations of safety

9

policies and leadership failures." *Id.* at 9. Defendant points out that Plaintiff agreed at her deposition that her violations "constituted a terminable offense, even if she personally did not agree with that." *Id.* at 12. Further, Defendant maintains that Plaintiff "has no evidence that . . . American's reasons are false nor does she have any evidence that they concocted to cover up a discriminatory reason." *Id.*

In response, Plaintiff first "concedes that Mr. O'Brien, Mr. Puleo, and Ms. Woods are not similarly situated comparators for purposes of the burden shifting framework outlined in McDonnell Douglas Corp v. Green, 411 U.S. 792 (1973)." [DE 30 at 6 n.1]. Next, she argues that, while she and Mr. Stafford did report to different direct supervisors, "that is not the full picture," since "Mr. Clementi made the decision about who decided the discipline to be issued to Ms. Grose and Mr. Stafford." [DE 30 at 6]. Plaintiff contends that "Ms. Grose and Mr. Stafford were, in a word, extraordinarily similarly situated. Ms. Grose and Mr. Stafford were both Customer Service Managers who engaged in similar conduct only one day apart at different airports. American conducted simultaneous investigations into the conduct of both individuals, but those investigations followed markedly different paths leading to drastically different outcomes . . . ." *Id.* at 7.

Plaintiff additionally argues that a genuine issue of material fact exists as to the credibility of Defendant's purported legitimate non-discriminatory reason for terminating Plaintiff's employment. [DE 30 at 7]. According to Plaintiff, Defendant ignored the relevant evidence and "treated Ms. Grose as 'guilty' from the start." *Id.* at 8. Finally, Plaintiff maintains that Defendant's purported business reason for terminating Plaintiff is undermined by the general atmosphere of discrimination. *Id.* Plaintiff contends that "Ms. Hightower complained about racism at PBI station to both Mr. Clementi and representatives from human resources who were investigating a

10

complaint that Ms. Hightower and Ms. Grose were racist against white people. Mr. Clementi promised to contact human resources, but no investigation was ever done." *Id.* at 9–10. Accordingly, Defendant's "failure to correct the 'racism' at PBI – which exists to this day – undermines and calls into question the legitimacy of American's reason for terminating Ms. Grose's employment." *Id.* at 10.

In Defendant's reply, it first argues that "American's decision to terminate Grose—like its motion for summary judgment—was based on Grose's own admissions and her version of events. American did not have to make credibility determinations in its investigation because Grose conceded all the relevant facts during the investigation, and has conceded them again in this lawsuit." [DE 35 at 1]. Defendant contends that, based on these undisputed facts, Defendant had a legitimate, non-discriminatory reason for terminating Plaintiff's employment. *Id.* at 2. According to Defendant, Plaintiff cannot establish a *prima facie* case of sex and race discrimination and "has failed to produce evidence showing that American's legitimate business reasons for her termination are untrue and are merely pretext for discrimination." *Id.* Defendant maintains that Plaintiff has not identified any legitimate factual disputes. *Id.* at 3. Defendant distinguishes Stafford's incident on the basis that Stafford's accident was "caused by the loss of situational awareness," whereas "each of Grose's violations was an intentional decision she made." *Id.* at 5. Defendant also asserts that Stafford and Grose are not similarly situated because different decision makers are involved. *Id.* at 5–6.

## V.   RELEVANT LAW

Title VII of the Civil Rights Act of 1964 ("Title VII") and the Florida Civil Rights Act of 1992 ("FCRA") make it unlawful to discharge an employee because of the employee's race or sex, 42 U.S.C. § 2000e-2(a)(1); § 760.10(1)(a), Fla. Stat. The FCRA is patterned after Title VII, and

11

claims for race and sex discrimination are analyzed under the same framework. *Dandridge v. Wal-Mart Stores, Inc.*, 844 F. App'x. 214, 215 (11th Cir. 2021).

In the absence of direct evidence, a circumstantial case is analyzed using the burden shifting framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that framework, a plaintiff must first prove that (1) she is a member of a protected class, (2) she was subjected to an adverse employment action, (3) the employer treated similarly situated, employees who were not members of the plaintiff's class more favorably and (4) she was qualified to do the job or to the benefit at issue. *Cooper v. Jefferson Cnty. Coroner and Med. Exam'r Off.*, 861 F. App'x 753, 756 (11th Cir. 2021); *see also Nealy v. SunTrust Bank*, No. 21-11358, 2021 WL 5112819, at *2 (11th Cir. 2021).

In *Lewis v. City of Union City, Georgia*, 918 F.3d 1213 (11th Cir. 2019), the Eleventh Circuit stated that the comparator leg of this analysis (assessment of "similarly situated" employees) is necessarily conducted at the *prima facie* stage of the *McDonnell Douglas* framework. *Id.* at 1217. To satisfy this requirement, a plaintiff "must demonstrate that she and her proffered comparators were 'similarly situated in all material respects.'" *Id.* at 1218. "This determination is one of 'substantive likeness,' an inherently fact-sensitive inquiry which must be made on a case-by-case basis." *Thompson v. McDonald*, No. 16-80811-CIV, 2019 WL 11314995, at *5 (S.D. Fla. Mar. 25, 2019), *aff'd sub nom. Thompson v. Sec'y, U.S. Dep't of Veterans Affs.*, 801 F. App'x 688 (11th Cir. 2020). Furthermore, "[e]xamples of 'similarly situated comparators' would ordinarily include persons who engaged in the same basic conduct (or misconduct) of the plaintiff; persons who were subjected to the same employment policy, guideline, or rule as plaintiff; persons who ordinarily, but not invariably, were under the jurisdiction of the same supervisor as the plaintiff, and persons who share the plaintiff's

employment or disciplinary history." *Id.* (internal citations omitted); *see also Stimson v. Stryker Sales Corp.*, 835 F. App'x 993, 997 (11th Cir. 2020) ("Ordinarily, a similarly situated comparator will have engaged in the same basic misconduct as the plaintiff, been under the same supervisor, shared the plaintiff's disciplinary and employment history, and been subject to the same employment policy.").

Once a plaintiff makes a *prima facie* case, the burden shifts to the defendant to proffer a legitimate reason for the adverse employment action. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). "The employer's burden [here] . . . is 'exceedingly light' and merely requires that the employer proffer a legitimate nondiscriminatory reason." *Bradley v. Pfizer, Inc.*, 440 F. App'x 805, 807 (11th Cir. 2011) (citations omitted). Once the defendant offers such a reason, the burden shifts back to the plaintiff to prove the proffered reason is mere pretext for illegal discrimination. *Menefee v. Sanders Lead Co.*, 786 F. App'x 963, 966 (11th Cir. 2019). To do so, "plaintiff must disprove all legitimate nondiscriminatory reasons proffered by the employer." *Bradley*, 440 F. App'x at 807. Even proof of discriminatory animus is not enough to prove pretext unless plaintiff also proves that the legitimate, nondiscriminatory reason is false. *See id.* Instead, the plaintiff must "show *both* that the employer's explanation was false, and that discrimination was the real reason for his decision." *Margolis v. Pub. Health Tr. of Miami-Dade Cty.*, 89 F. Supp. 3d 1343, 1351 (S.D. Fla. Feb. 26, 2015).

Courts "do not sit as a 'super personnel department,' and must take care not to second-guess the employer's business judgment." *Ostrow v. GlobeCast Am. Inc.*, 489 F. App'x 433, 436 (11th Cir. 2012) (quotations and citation omitted). The court's assessment is not concerned with whether the employer's decision was prudent or fair; it is only concerned with whether it was discriminatory. *Alvarez*, 610 F.3d at 1266 ("[I]t is not our role to second-guess the wisdom of an

employer's business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive.") (*citing Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000)).

Plaintiff's "failure to produce a comparator does not necessarily doom [her] case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1328 (11th Cir. 2011). "Instead, she may establish a 'convincing mosaic' of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker by pointing to evidence such as (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) systematically better treatment of similarly-situated employees, and (3) pretext." *Daneshpajouh v. Sage Dental Grp. of Fla., PLLC*, No. 19-CIV-62700-RAR, 2021 WL 3674655, at *12 (S.D. Fla. Aug. 18, 2021) (citing *Lewis*, 934 F.3d at 1185). "When undertaking a convincing mosaic analysis, the Court first considers whether [Defendant's] cited reasons for firing [Plaintiff] are merely a pretext for discrimination." *Key v. Cent. Ga. Kidney Specialists, P.C.*, No. 19-00253, 2020 WL 7053293, at *6 (M.D. Ga. Oct. 28, 2020). The pretext inquiry requires Plaintiff to "demonstrate[] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005). Critically, though, "a reason is not pretext for discrimination unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007).

## VI.     DISCUSSION AND ANALYSIS

<u>Plaintiff's *Prima Facie* Case of Discrimination</u>

Defendant's argument that there is no direct evidence to support Plaintiff's claims is unrebutted. Plaintiff has made no argument whatsoever in her response to Defendant's Motion for Summary Judgment that there is, in fact, sufficient direct evidence to support her claims in this case.[1] Therefore, the Court finds that no direct evidence exists to support Plaintiff's claims.

As this is a circumstantial evidence case, the Court must utilize the burden shifting framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Defendant does not dispute that Plaintiff is a Black female and is thus a member of a protected class. [DE 23 at 6]. Defendant also does not dispute that Plaintiff was terminated or that she was "generally qualified for the position." *Id.* at 6–7. Defendant simply argues that Plaintiff "cannot establish that American treated similarly situated, non-black or non-female employees better than she." *Id.* at 7.

In response, Plaintiff claims that Mr. Stafford is a valid comparator. [DE 30 at 6]. First, Defendant tries to distinguish Michael Stafford on the basis that "Stafford's incident was an accident caused by the loss of situational awareness" and "each of Grose's violations was an intentional decision she made." [DE 35 at 5]. The facts surrounding the Stafford incident are described in Defendant's Statement of Material Facts at paragraphs 38 and 39.

> 38. In December 2019, Stafford was moving a set of air stairs to the ramp area at TPA. (Clementi Dep. at 9:4–13, ECF No. 22-4.) Air stairs are stairs placed on the side of the plane to allow passengers to get on and off. (Pl. Dep. Vol. 2 at 117:5–9, ECF No. 22-2.) Stafford should not have been on the air stairs. (*Id.* at 114:3–116:1.) Stafford was distracted by the movement of another plane and as a result accidentally hit the tail of it with the air stairs, causing damage to the plane. (*Id.*;

---

[1] The Court also notes that the undisputed material facts at Def.'s SMF ¶ 35 states, "[n]either Grose's race nor sex had any bearing on Clementi's decision to terminate her. (Clementi Dep. 31:21–32:2, ECF No. 22-4.) The decision was based on the December 28, 2019, incident and the egregious violation of policies. (*Id.* at 18:10–19:21.)." Thus, there is not only a clear lack of direct evidence to support Plaintiff's claims, but there is also undisputed evidence that contradict Plaintiff's claims.

15

> *see also* Clementi Dep. 25:25–26:12, ECF No. 22-4.) Stafford immediately reported the incident before the plane departed, consistent with American's policies. (Pl. Dep. Vol. 2 at 114:20–22; 117:16–118:6, ECF No. 22-2.)
>
> 39. When the investigation into this incident was complete, it was determined that Stafford's conduct was accidental and the result of him losing situational awareness. (Clementi Dep. at 25:22–26:5, ECF No. 22-4.) Stafford was given a written reprimand and prohibited from driving ground equipment but was not terminated for the offense. (*Id*. at 10:15–19; *see also* Pl. Dep. Vol. 2 at 115:1–6, ECF No. 22-2.)

Plaintiff does not dispute these facts.

The Court notes that, while Plaintiff's and Stafford's conduct was somewhat similar, it is undisputed that Stafford did immediately report the incident, whereas Plaintiff did not. Plaintiff contends that her supervisor had been out for a serious medical issue at the time of the incident and that she did not need to report the incident pursuant to American's policies because she merely "tapped" the aircraft. [DE 30 at 6]. Plaintiff's conduct raises safety concerns as Plaintiff did not immediately notify anyone of the incident so the area of contact on the airplane could be inspected before the airplane departed. In this regard, the Court does find that Plaintiff's failure to report the incident immediately and prior to the plane's departure distinguishes her from Stafford and weighs against Stafford being a proper comparator. However, the Court rejects Defendant's argument that Stafford is not a proper comparator because Stafford's conduct was accidental while Plaintiff's was not. Such argument is not supported by the record.

Second, Defendant argues that different decision makers determined the appropriate disciplinary action to take against Plaintiff and Stafford. [DE 35 at 6]. Clementi was the individual who made the decision to terminate Plaintiff's employment. [Def.'s SMF ¶ 30]. Frankie Jamison was Stafford's supervisor; however, according to Plaintiff, Clementi permitted Jamison to conduct

16

the investigation and make the determination as to how to discipline Stafford. [Pl.'s Resp. SMF ¶ 37]. Plaintiff argues that

> Mr. Stafford reported to Mr. Frankie Jamison while Ms. Grose reported to Ms. Ruth Hightower. Both Mr. Jamison and Ms. Hightower reported to Mr. Clementi. Mr. Clementi made the decision about who decided the discipline to be issued to Ms. Grose and Mr. Stafford. Mr. Clementi allowed Mr. Jamison to decide the discipline to be issued to Mr. Stafford but excluded Ms. Hightower until he had already made the decision to terminate Ms. Grose, despite Ms. Hightower's repeated requests to provide input. Ultimately, the decision rested with Mr. Clementi.

[DE 30 at 6]. Defendant replies that

> Contrary to the general rule, Grose suggests that the fact that different decision-makers reached different decisions about employees engaged in different conduct is somehow indicative of discrimination because Clementi could have stepped in and taken additional action with respect to Stafford if he had wanted. (Resp. Br. at 6.) That argument makes no sense and does not tend to show that similar people were treated differently. And Clementi's involvement in Grose's case came about because Grose failed to timely report the incident, which meant that Clementi learned about it from company safety officers instead of through Grose's direct reporting line.

[DE 35 at 6]. The Court agrees that different decision-makers were involved with Stafford and Plaintiff and that this weighs against Stafford's appropriateness as a comparator. Further, as noted above, the fact that Stafford immediately reported the incident prior to the plane's departure, whereas Stafford did not report the incident for two days, well after the plane's departure, further weighs against Stafford's appropriateness as a comparator. Safety reasons clearly support that any such incident be reported prior to the plane's departure.

Based on the foregoing, the Court finds that Plaintiff has not sufficiently established a proper comparator and thus has failed to demonstrate a *prima facie* case of discrimination on the basis of race and gender. However, in an abundance of caution, and to provide added clarity, the Court will continue with its analysis as if a proper comparator and a *prima facie* case of discrimination on the basis of race and gender has been established by Plaintiff. That is, for the

17

purpose of the following analysis, the Court will assume that Plaintiff has established a *prima facie* case of discrimination on the basis of race and gender.

### Defendant's Legitimate Reason for the Adverse Employment Action

Plaintiff argues in her response to Defendant's Motion for Summary Judgment that Defendant basically has treated her as guilty from the start of the investigation into the relevant incident and even ignored the exculpatory testimony given by Mr. O'Brien. [DE 30 at 8]. In its reply, Defendant explains, "Grose argues that summary judgment is improper because she insists that the credibility of American's legitimate business reasons should be assessed by a factfinder at trial. (Resp. Br. at 7.) That is not the proper standard." [DE 35 at 6].

It appears to the Court that Plaintiff has impliedly conceded in her response that Defendant gave a legitimate reason for the adverse employment action, and, rather, Plaintiff appears more focused on her argument that there was a pretext for illegal discrimination. It appears that, in her response, Grose has somewhat conflated her legitimate reason argument with her pretext argument. Regardless, it is clear to the Court that Defendant has met its "exceedingly light" burden and has proffered a legitimate nondiscriminatory reason for terminating Plaintiff. *Bradley*, 440 F. App'x at 807. Plaintiff did something that was unsafe. Plaintiff got on a belt loader and operated it in a manner that caused it to tap or touch the plane, and then failed to immediately report it before the plane departed despite the fact that one of Defendant's primary goals is to ensure safety. The facts of this case show that Plaintiff even conceded in an email that she had "just breached safety last week to the ramp." [Def.'s SMF ¶ 25].

### Whether There Was a Pretext for Illegal Discrimination

Defendant contends that "[e]ven if Grose did provide evidence that American's reasons were false, she has not provided any evidence that the real reason for her termination was hidden

discrimination." [DE 35 at 7]. The Court agrees. In Plaintiff's response, she argues that the evidence shows that Mr. O'Brien directed another employee to drive the belt loader from a different gate and also shows that Plaintiff simply tapped the aircraft. [DE 30 at 8]. It seems that Plaintiff is really asserting in her response that the investigation into the incident by Defendant was inherently flawed and biased toward Plaintiff. However, Plaintiff has failed to meet her burden of proving that the proffered reason for termination is a mere pretext for illegal discrimination. She has not disproven all legitimate nondiscriminatory reasons proffered by the employer or that discrimination was the real reason for Clementi's decision. Instead, she has made vague allegations that the investigation was insufficient or unfair. However, this Court's assessment is not concerned with whether the employer's decision was prudent or fair; it is only concerned with whether it was discriminatory.

## Plaintiff's Convincing Mosaic Argument

Finally, Plaintiff makes a "convincing mosaic" argument in her papers. She contends that, "Ms. Hightower complained about racism at PBI station to both Mr. Clementi and representatives from human resources who were investigating a complaint that Ms. Hightower and Ms. Grose were racist against white people. Mr. Clementi promised to contact human resources, but no investigation was ever done." [DE 30 at 9–10]. According to Plaintiff, "[e]ven when Ms. Hightower complained directly to human resources that there was a problem at PBI station – a problem at every level – American did not take any action. American's failure to correct the 'racism' at PBI – which exists to this day – undermines and calls into question the legitimacy of American's reason for terminating Ms. Grose's employment." *Id.* at 10.

In reply, Defendant asserts that "Grose's manager's complaints about her supervisees do not provide evidence of pretext. Grose has not presented any evidence that her supervisors were

19

racist (other than that which asserts that Hightower and Grose themselves were discriminatory)." [DE 35 at 8]. Defendant also maintains that Plaintiff "has not presented any evidence satisfying her burden to show that American's decision was a ruse for discrimination. Even assuming there was any 'general atmosphere of discrimination,' the only evidence Grose has presented suggests that she and Hightower were the ones responsible for it." *Id.*

In order to establish a "convincing mosaic" of circumstantial evidence, the Court must first consider whether Defendant's claimed reasons for firing Plaintiff were merely a pretext for discrimination. *Key*, 2020 WL 7053293, at *6. In other words, Plaintiff is required to demonstrate weaknesses, inconsistencies, or contradictions in Defendant's proffered legitimate reasons for terminating Plaintiff that a reasonable factfinder could find them unworthy of credence. *Jackson*, 405 F.3d 1276 at 1289. Plaintiff has completely failed to make the requisite showing. Thus, the Court finds that Plaintiff has failed to establish a "convincing mosaic" of circumstantial evidence.

## VII.   CONCLUSION

Based on the foregoing, it is hereby **ORDERED AND ADJUDGED** that Defendant's Motion for Summary Judgment [DE 23] is **GRANTED**. Summary judgment is hereby entered in favor of Defendant as to Counts I, II, III, and IV of the Complaint. Final judgment shall be entered separately.

**DONE and ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 11th day of July, 2022.

*William Matthewman*
WILLIAM MATTHEWMAN
United States Magistrate Judge